*E-FILED 8/6/2008*

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JEFFREY GIPPETTI, | No. C07-00812 RMW (HRL) |
| Plaintiff, | **ORDER DENYING PLAINTIFF'S MOTION FOR SANCTIONS** |
| v. | |
| UNITED PARCEL SERVICE, INC., | [Re: Docket No. 63] |
| Defendant. | |

Presently before this court is plaintiff Jeffrey Gippetti's "Motion for Sanctions for Spoliation." Defendant United Parcel Service ("UPS") opposes the motion. Upon consideration of the moving and responding papers,[1] as well as the arguments presented at the July 15, 2008 motion hearing, this court denies the motion.

**I. BACKGROUND**

Plaintiff filed the instant action in state court for alleged age discrimination. UPS removed the matter here, asserting diversity jurisdiction. Gippetti was, until September 2004, a

---

[1] Defendant objects to certain portions of plaintiff's May 7, 2008 declaration on one or more of the grounds of lacking in foundation, speculative, argumentative, no personal knowledge, conclusory, or hearsay. This court addresses, in the main text of this order, only those objections necessary to the resolution of the instant motion. As for defendant's other evidentiary objections, UPS claims, in net effect, that some of Gippetti's statements were really argument in disguise. Some portions were. However, this court's ruling on the instant motion does not depend on whether the other challenged portions of Gippetti's declarations were properly authenticated and admissible "testimony" or whether they were nothing more than argument. The court appreciated what was argument and considered the declaration for what it was worth.

1  driver employed by UPS who drove the SU09 route to pick up packages at the Oakland airport
2  and deliver them to Sunnyvale. He alleges that UPS fired him because of his age (reportedly,
3  he was about 44 years old at the time). UPS contends that Gippetti's termination had nothing to
4  do with his age. It maintains that he was fired for "stealing time" (i.e., sleeping on the job
5  during periods he claimed to be working, taking excessive rest breaks and inaccurately
6  recording meal and rest breaks) and because he did not properly complete truck safety
7  inspections required by UPS and government regulations.

8        The instant motion grew out of a discovery dispute over plaintiff's request for the
9  production of tachograph records for the SU09 route. Tachograph records show a vehicle's
10 speed and the length of time it is moving or stationary. In November 2007, plaintiff served a
11 request for tachograph records for the SU09 route from September 1, 2004 to the present. In
12 response, UPS advised that its policy was to retain tachographs for only a limited period of
13 time, but it agreed to produce all responsive tachographs located after reasonable search and
14 diligent inquiry.

15       UPS produced several of plaintiff's tachograph records for the SU09 route from
16 September 2004, as well as the tachograph records for that route from December 10, 2007 to
17 February 15, 2008. UPS advises that, on October 2, 2007, it moved the Santa Cruz leg of the
18 SU09 route to the SU23 route; so, it also produced tachograph records for the SU23 route from
19 December 10, 2007 to February 15, 2008. UPS says that it will continue to produce responsive
20 tachographs on an ongoing basis. However, defendant says that it has not been able to locate
21 any other responsive tachographs because its practice is, and since 2002 has been, to preserve
22 such records for only 37 days due to the large volume of the data.

23       Plaintiff then moved this court for an order compelling UPS to produce, among other
24 things, the requested tachograph records, as well as a copy of its document retention policy. He
25 did not request the policy before moving for an order compelling its production. Nonetheless,
26 at this court's suggestion, UPS agreed to and apparently did produce documentation of its
27 tachograph retention practices. (See Scher Decl., ¶ 13). To the extent plaintiff also sought
28

2

sanctions for alleged spoliation in his motion to compel, his motion was deemed premature and was denied without prejudice.

Plaintiff now moves for sanctions for alleged spoliation of the tachographs of the other drivers who drove the SU09 route. On the record presented, there appears to be no dispute that since 2002, defendant's nationwide practice has been to electronically store tachograph records and to automatically purge them after 37 days due to the high volume of data. (Perks Decl., ¶ 4). Plaintiff maintains that UPS nonetheless had notice that the tachographs of other SU09 route drivers should have been preserved. He seeks a court order finding that the destroyed tachograph records "would support that Plaintiff did not drive Route SU09 any differently than employees who were under the age of 40 years old." (Mot. at 1:24-25). UPS says that, until recently in this litigation, it had no reason to believe that all tachographs had any bearing on plaintiff's age discrimination claim before those records were destroyed years ago in accordance with the company's retention policy.

## II.  LEGAL STANDARD

Spoliation occurs when a party intentionally destroys documents with knowledge that the records were potentially relevant to litigation before they were destroyed. See United States v. Kitsap Physicians Service, 314 F.3d 995, 1001 (9th Cir. 2002) ("Defendants engage in spoliation of documents as a matter of law only if they had 'some notice that the documents were potentially relevant' to the litigation before they were destroyed.") (citing Akiona v. United States, 938 F.2d 158, 161 (9th Cir. 1991)). Courts may impose sanctions as part of their inherent power to manage their cases so as to achieve the orderly and expeditious disposition of cases. In re Napster, Inc. Copyright Litig., 462 F. Supp.2d at 1066. Courts may sanction spoliation by (a) instructing the jury to draw an adverse inference against the party or witness responsible for the destruction of evidence; (b) excluding testimony based on the destroyed evidence; or (c) entering default judgment against the party responsible for destroying the evidence. Id.

The destruction of evidence need not be in "bad faith" to warrant the imposition of sanctions. Id. "However, a party's motive or degree of fault in destroying evidence is relevant

3

1  to what sanction, if any, is imposed." Id. at 1066-67; see also Fed.R.Civ.P. 37(e) ("Absent
2  exceptional circumstances, a court may not impose sanctions under these rules on a party for
3  failing to provide electronically stored information lost as a result of the routine, good-faith
4  operation of an electronic information system.").

## III. DISCUSSION

6  Although Gippetti insists that the tachographs of other drivers are relevant, this court is
7  hard pressed to understand how those records have any bearing on his age discrimination
8  claims. He contends that the destroyed tachographs would have shown that UPS employees
9  were subject to "differential treatment" based on age. According to Gippetti's theory of the
10 case, he was fired because he failed to timely drive the SU09 route to make the first scheduled
11 pick-up at the Oakland airport (a feat which, he claims, was impossible to accomplish). He
12 further contends that UPS criticized Lynn Valdez (identified as a UPS driver over the age of 40
13 who took over the SU09 route after plaintiff was fired) for failing to timely handle the route.
14 However, plaintiff claims that the relief drivers who drove the SU09 route after he was fired
15 also had problems in timely driving the route, but were not fired or criticized. He further posits
16 that all of the relief drivers are younger drivers under the age of 40. In sum, plaintiff argues that
17 the tachographs would have substantiated his contention that younger drivers handled the SU09
18 route in the same manner he did, but were not criticized or fired for "stealing time" when their
19 engines were not running and they had not "clocked out." He also argues that the destroyed
20 tachographs would have shown that other drivers decoupled or unhooked their trucks at the
21 Santa Cruz terminal the same way plaintiff says he did.

22 However, defendant has produced evidence showing that several of the relief drivers
23 were also 40 years old or older at the time they drove the SU09 route in 2004 and 2005. (See
24 Scher Decl., ¶ 14, Ex. E). Plaintiff maintains that the destroyed tachographs are still significant,
25 but he acknowledged at oral argument that he cannot refute that at least some of the relief
26 drivers were over 40 years old. Moreover, it is not apparent that the destroyed tachographs
27 would have shown how other drivers decoupled or unhooked their trucks at the Santa Cruz
28 terminal. Gippetti does not dispute that the tachographs themselves show nothing more than

4

whether the truck's engine is on and, if the truck is moving, how fast it is moving.  (See, e.g., Cademarti Decl., ¶ 8, Ex. A).

Even assuming the requested tachographs were relevant, Gippetti has not presented evidence demonstrating that UPS had notice that the records should have been preserved before they were destroyed in accordance with its normal retention policy.  Plaintiff says that, in September or October 2004, he asked his union representative, Jerry Sweeney, to have UPS produce the tachographs of other drivers for use in the first panel of his grievance proceedings.  He claims that Sweeney asked Frank Cademarti (defendant's Northern California District Labor Manager who represented UPS at the grievance proceedings) for the tachographs and that Cademarti refused.  Cademarti attests that no such request was ever made by Gippetti or Sweeney, and further avers that he did not know Gippetti wanted the tachographs for other drivers at any time before he served his document request in November 2007.  (Cademarti Decl., ¶¶ 3-5).

Gippetti offers no admissible evidence to the contrary.  The only "evidence" he submits in support of his contention is his own hearsay testimony that "Sweeney told me he had spoken to Cademarti and Cademarti told him that they would not be produced."  (Gippetti Decl., ¶ 13).  Plaintiff maintains that the statement is not hearsay.  However, it is being offered to prove the truth of the matter asserted – i.e., that Sweeney asked Cademarti for the tachographs.  Accordingly, the statement is hearsay, and this court is not convinced that an exception applies to show Sweeney's or Cademarti's alleged state of mind.  See FED.R.EVID. 803(3).  Plaintiff argues that there is no reason why he wouldn't have asked for the tachographs.  Here, he says that his declaration must be credited over Cademarti's because Sweeney and Cademarti were buddies; and, in his opinion, Sweeney "sold out to UPS."  (Gippetti Decl., ¶ 13).  However, these assertions lack foundation and are speculative.

Plaintiff's other arguments fare no better.  Gippetti says that UPS had requisite notice from his September 15, 2005 DFEH complaint, which states:

> I also believe that I was wrongfully discharged, false accusations, alleged theft of time, inaccurate time card issues, *differential treatment*, untimely manor [sic] and procedures for firing and not following the contract between the Teamster Union and United Parcel Service.

5

1  (Gippetti Decl., Ex. C) (emphasis added).  He argues that the phrase "differential treatment,"
2  coupled with a reference to an NLRB decision, United Parcel Service, Inc. and Robert W.
3  Bowlds and David E. Perkins, Cases 25-CA-11313 and 25-CA-11313-2 (1982), was a clear
4  signal that the tachograph records of other drivers should have been preserved.

5  However, Gippetti acknowledges that he did not allege age discrimination during his
6  grievance proceedings.  (Scher Decl., ¶ 3, Ex. A (Gippetti Depo. at 205:17-20)).  The vague
7  reference to "differential treatment" and the NLRB decision was not sufficient to put UPS on
8  notice that the tachographs of other drivers were relevant.

9  Next, Gippetti argues that testimony by a UPS employee at the 2006 arbitration hearing
10 indicates that he was not fired for "stealing time."  The cited transcript is said to be an excerpt
11 from the testimony of Wayne Steinberg (identified as a UPS management employee):

12 Q:  After Mr. White talked to you about Mr. Gippetti arriving late, what did you do?
13 A:  I went through Mr. Gippetti's time cards and tachograph reports for, I want to
14      say, it was three days.  I provided those to you, I believe.  It was three days.  And
15      I noticed a discrepancy taking place in our Santa Cruz facility.
16 Q:  What kind of discrepancy?
17 A:  The engine wasn't running when his time card said he was working.

18 (Gippetti Decl., ¶ 18, Ex. B (Transcr. 19:24-20:8)).  However, it is not clear how this testimony
19 put UPS on notice that the tachographs of all drivers for the SU09 route should have been
20 preserved.  Plaintiff seems to suggest that UPS cannot credibly claim that it did not know that
21 all tachographs should have been saved because it used his own tachographs to support its
22 arguments at the arbitration.  But plaintiff's time and how he spent it apparently was precisely
23 the issue in dispute.

24 In sum, the record presented shows only that the tachographs were maintained and then
25 destroyed several years ago in the normal course of UPS's business in accordance with the
26 company's retention policy.

27 At any rate, UPS says that it has produced the time cards for other drivers which contain
28 essentially the same information – that is, the time cards reportedly show (a) the start and

6

1 ending time for each task (e.g., starting work ("SW"), leaving a facility ("LV"), turnaround
2 ("TA"), taking a meal ("M"), taking a break ("B") and finishing work ("FW").  (Cademarti
3 Decl., ¶ 9 and Ex. B).  UPS argues that, if Gippetti wants to compare his route time with the
4 other drivers, he has the information he needs from the time cards.  Gippetti does not directly
5 challenge this assertion, but argues that the tachographs would have enabled him to make a
6 more accurate comparison.  Perhaps the destroyed tachographs would have provided a more
7 accurate record of how the other Route SU09 drivers spent their time and when they completed
8 the route.  However, this court does not find that Gippetti has been seriously prejudiced by the
9 destruction of records that have no apparent bearing on his age discrimination claims in the first
10 instance.

## IV.  ORDER

Based on the foregoing, IT IS ORDERED THAT plaintiff's motion for sanctions for spoliation is DENIED.

Dated:    August 6, 2008

HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

7

1  **5:07-cv-812 Notice has been electronically mailed to**:

2  Leslie D. Ellis leslieellis@paulhastings.com, jeffsmith@paulhastings.com

3  Laura Beth Scher laurascher@paulhastings.com, janetgogna@paulhastings.com

4  M. Van Smith mvsmith@sbcglobal.net

5  Sana Swe sanaswe@paulhastings.com, daliaromhill@sbcglobal.net

6  **Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program**.